GENCOM INCORPORATED, Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

Metro Mobile CTS of Phoenix, Inc., Intervenor.

No. 84–1552.

United States Court of Appeals, District of Columbia Circuit.

Argued April 6, 1987.

Decided Oct. 30, 1987.

As Amended Oct. 30, 1987.

Carl W. Northrop, with whom Rachelle B. Chong, Washington, D.C., was on the brief, for appellant. Eliot J. Greenwald, Washington, D.C., Jennifer S. Reader, New Orleans, La., and W. Theodore Pierson, Washington, D.C., also entered appearances for appellant.

Roberta L. Cook, Counsel, F.C.C., with whom Jack D. Smith, General Counsel, and Daniel M. Armstrong, Associate General Counsel, F.C.C., Washington, D.C., were on the brief, for appellee.

Stuart F. Feldstein, with whom Robert J. Keller, Washington, D.C., was on the brief, for intervenor. Aaron I. Fleischman and Robert J. Miller, Washington, D.C., also entered appearances for intervenor.

Before WALD, Chief Judge, and MIKVA and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

This case arises from a decision by the Federal Communications Commission ("FCC" or "Commission") to grant the application of Metro Mobile CTS of Phoenix, Inc. ("Metro Mobile") for a permit to establish a new cellular radio communications system and to deny the mutually exclusive application of Gencom, Inc. ("Gencom"). In its petition for review, Gencom attacks the FCC's determination on a variety of both procedural and substantive grounds. First, Gencom claims that the Commission erred in refusing to grant its request for an evidentiary hearing to determine whether Metro Mobile misrepresented the availability of one of its proposed antenna sites. Second, Gencom contends that the Commission erred in awarding its rival a comparative preference for the greater geographic and population coverage of its system, without considering evidence tendered by Gencom that Metro Mobile's superior coverage was not cost-justified. Third, Gencom argues that the FCC committed reversible error in refusing to award it a comparative preference for its assessment of demand in the Phoenix market. Finally, Gencom asserts that the FCC "failed to engage in reasoned decisionmaking" when it refused to award it a comparative preference on the issue of system expansion. Because we find that the Commission acted lawfully in all respects, we deny the petition for review.

## I.

Cellular radio systems use a number of low-power transmitters to provide mobile telephone communications service in a given metropolitan area.[1] Recognizing the many benefits this new technology offered to the public, the FCC promulgated rules mandating expedited hearing procedures and establishing comparative criteria directed to selecting the best qualified applicants to establish such systems with a minimum of bureaucratic delay. *See Cellular Communications Systems,* 86 F.C.C.2d 469 (1981) (Report and Order) (hereinafter *Cellular Rulemaking*), *modified,* 89 F.C.C.2d 58, *further modified,* 90 F.C.C.2d 571 (1982), *petition for review dismissed sub nom. United States v. FCC,* No. 82–1526 (D.C.Cir. Mar. 3, 1983).

In its *Cellular Rulemaking* the FCC outlined the procedures for the evaluation of competing cellular applications. Based on its "goal of having cellular service available to the public as quickly as possible" and its recognition that the evidence presented in comparative proceedings would be largely technical and economic, the Commission found that comparative

---

1. Cellular communication systems are to be distinguished from conventional radio-telephone technology. The latter employs a single high-powered transmitter and possesses a maximum capacity of 44 channels. A cellular system is composed of a grouping of low-powered transmitters, or "cells," dispersed throughout the intended service area. Each cell can carry up to 666 channels. As a telephone-equipped vehicle travels through the service area, transmission of the conversation is shifted from one cell to another. Cellular thus offers superior signal quality and a greater number of communication channels than its technological predecessor. *See generally MCI Cellular Tel. Co. v. FCC,* 738 F.2d 1322 (D.C.Cir.1984).

evaluations "would not ordinarily be enhanced by the traditional courtroom drama of oral presentation by witnesses on the stand." *See Cellular Rulemaking*, 86 F.C.C.2d at 498–99. The Commission concluded that "a procedure involving only a 'paper' hearing and evidence, decided by the administrative law judge, will best serve the public interest while protecting the procedural interests of the competing private parties."[2] *Id.* at 499.

As to the substance of the hearings, the Commission identified two major criteria that would be central in its comparative evaluation of proposed cellular systems. First, the FCC indicated that:

> Because nationwide availability of service is a primary goal, a major basis of comparison will be the geographic area that an applicant proposes to serve. In comparing proposed service areas, other significant factors to be considered will be the presence of densely populated regions, highways, and areas likely to have high mobile usage characteristics....

*Cellular Rulemaking*, 86 F.C.C.2d at 502.

The second major comparative factor established by the Commission is the applicant's ability to expand its system capacity in a coordinated manner in order to accommodate increasing demand for service. *See Cellular Rulemaking*, 86 F.C.C.2d at 502.

## A. The Phoenix Proceeding

On June 7, 1982, three companies—Metro Mobile, Gencom and Cellular Mobile Systems ("CMS")—filed applications for a construction permit to establish a new cellular radio system in Phoenix, Arizona. By order dated January 31, 1983, the FCC found each of the three applicants for the Phoenix market to be legally, technically, and financially qualified to construct and operate its proposed cellular system. *See Advanced Mobile Phone Service, Inc.*, 48 Fed. Reg. 6030 (1983) (hereinafter *Phoenix Designation Order*). The Commission, through its Common Carrier Bureau, designated the applications for comparative hearing and ordered that the applicants be compared on the following factors: (a)(1) the geographic and population area that each applicant proposed to serve, (a)(2) the relative demand for cellular service within those areas, (a)(3) the ability of each applicant's proposed system to accommodate the anticipated initial demand; (b) the proposed expansion plans of each applicant to meet future demand; and (c) the rates, maintenance, personnel and facilities proposed.[3]

### 1. The Site No. 5 Dispute

At the time the Phoenix cellular applications were filed, FCC rules required applicants to supply evidence that each proposed antenna site was available for use.[4]

**2.** We note that the Commission's adoption of a paper hearing procedure conforms with the strictures of the Administrative Procedure Act. *See* 5 U.S.C. § 551 *et seq.* (1982). Nothing in § 409 of the Communications Act of 1934, which deals with FCC hearings in general, *see* 47 U.S.C. § 409 (1982), nor § 309, which deals specifically with licensing proceedings, *see* 47 U.S.C. § 309(e) (1982), uses the "on the record" language necessary to trigger the full panoply of trial-like hearing requirements embodied in § 554 of the APA. *See* 5 U.S.C. § 554(a) (1982). In addition, § 556(d) of the APA contains an express exemption which provides that, in processing applications for initial licenses, "an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form." 5 U.S.C. § 556(d) (1982). *See Cellular Mobile Systems v. FCC*, 782 F.2d 182, 197–98 (D.C.Cir.1985) (hereinafter *CMS (Pittsburgh)*).

**3.** *See Phoenix Designation Order*, 48 Fed.Reg. at 6030. Although not explicitly required by the

designation order, the Administrative Law Judge ("ALJ"), the Commission, and all parties to this appeal treated issue (a) (the "coverage issue") as divided into three distinct subissues. Thus both the ALJ and the Commission awarded comparative preferences on issues (a)(1), (a)(2) and (a)(3) in arriving at an overall comparative evaluation of the applicants on the overarching coverage criterion. The FCC has so subdivided the coverage issue in its previous comparative proceedings in other markets. *See, e.g., CMS (Pittsburgh)*, 782 F.2d at 188–97.

**4.** *See* 47 C.F.R. § 21.15(a) (1981) ("Applicants proposing a new station location ... shall indicate whether the station site is owned. If it is not owned, its availability for the proposed radio station shall be demonstrated. Under ordinary circumstances this requirement will be considered satisfied if the site is under lease or under written option to buy or lease...."). The FCC has since altered its regulations to require that applicants merely certify that the specified

Pursuant to this requirement, Metro Mobile stated in its application that it had "received from the owner or authorized agent of each of the cell sites proposed herein a commitment to lease or to negotiate a lease for the land, building, and/or tower space necessary to construct the facilities proposed at each location." *See* Metro Mobile Application, FCC Form 401, Exhibit 10 at 4, Joint Appendix ("J.A.") at 96.

For its proposed cell site No. 5, Metro Mobile submitted a letter, dated May 13, 1982, from Mike and Helene Eslinger, to Jack Brennan, a Vice–President of Metro Mobile.[5] The letter stated that the Eslingers would be willing to enter into a lease with Metro Mobile for space at 5335 E. Hillery, Scottsdale, Arizona. The Eslinger letter went on to state that to the best of their knowledge, Metro Mobile's antenna could be accommodated on their premises "without any interference to or from any apparatus presently on the building." J.A. at 101.

On February 24, 1983, some three weeks after release of the FCC's designation order framing the issues, Gencom filed a "Motion to Enlarge Issues Concerning Site Availability, Site Suitability and Possible Misrepresentation." *See* J.A. at 269–312. In its motion, Gencom noted that Metro Mobile's proposed site No. 5 was the home of the Eslingers and that Helene Eslinger was a real estate agent retained by Metro Mobile to locate antenna sites for its proposed system. *Id.* at 274. Gencom asserted that Metro Mobile had no bona fide intention of using proposed site No. 5 and

had no reasonable assurance that the site was genuinely available for use. In fact, Gencom alleged, Metro Mobile had already completed negotiations for the use of a site other than the Eslingers' property.

In support of these allegations, Gencom submitted the affidavit of Ronald Zemaitis, a real estate broker hired by Gencom to "investigate" site No. 5. *See* J.A. at 291. The Zemaitis affidavit, dated October 25, 1982, purported to relate a conversation which occurred between Zemaitis and Mrs. Eslinger on September 9, 1982. Zemaitis stated that Mrs. Eslinger had informed him that the site Metro Mobile had anticipated using for cell No. 5 was not available when its application was filed, and that she had substituted her own home as a cell location until negotiations could be completed regarding the preferred site. *Id.* at 291–92.[6] Gencom also submitted evidence that the East Hillery location was in the middle of a residential neighborhood and that only limited space was available at the proposed site.

In opposition to Gencom's motion, Metro Mobile claimed that it had, and continued to have, a reasonable assurance that the site would be available for its intended use. *See* J.A. at 315–23. In support of this claim, Metro Mobile submitted two affidavits—one from Mrs. Eslinger—the other from its Vice–President, Jack Brennan. In her affidavit, Mrs. Eslinger confirmed that the East Hillery property "was available for use as a tower site when my husband, Michael, and I signed a letter to that effect on May 13, 1982; it has been continually

---

sites are available, rather than supplying direct evidence of site availability. *See* Revision and Update of Part 22 of the Public Mobile Radio Service Rules, 95 F.C.C.2d 769, ¶¶ 29–31 (1983), *modified on other grounds,* 101 F.C.C.2d 799 (1985). The change obviates the need for applicants to provide evidence extrinsic to the application indicating that sites are available. *Id.*

**5.** Metro Mobile filed the Eslinger letter with the Commission as an amendment to its application on July 29, 1982. In its amendment Metro Mobile stated that while it believed the site availability representation made in its application satisfied the Commission's requirements, it was providing the Commission with commitment letters for all its sites to "clear up any

questions in this regard." Metro Mobile Amendment No. 2, Form 401, Legal Information, J.A. at 99. Metro Mobile also emphasized the fact that the Eslinger availability letter was dated May 13, 1982, demonstrating that the site was available *before* Metro Mobile filed its initial application on June 7, 1982. *Id.*

**6.** The Zemaitis affidavit supplied little support for Gencom's contention that Metro Mobile had in fact located another site. An appendix attached to the Zemaitis affidavit, purporting to be his notes of the September 9, 1982 conversation with Mrs. Eslinger, baldly stated, "[t]he site to replace her private residence has now been negotiated and made available, but we were not informed as to its location." J.A. at 294.

available since that time; and it is still available." J.A. at 333. Mrs. Eslinger also denied ever having spoken to Mr. Zemaitis concerning Metro Mobile and indicated that to the best of her knowledge Metro Mobile had not obtained any alternative site for cell No. 5. *Id.* The Brennan affidavit affirmed that the Eslinger property "remains the intended location" for Metro Mobile's site No. 5. It further stated that "[n]o alternative location for cell Number 5 has been obtained. Nor is it Metro Mobile's present intention to so obtain an alternate location." *Id.* at 335.

On June 10, 1983, the Administrative Law Judge ("ALJ") issued a decision denying Gencom's motion to designate site availability and misrepresentation issues against Metro Mobile. *See* J.A. at 386–90. The ALJ determined that although the property was in a residential area, Gencom had not shown that the Eslingers were unwilling to permit the necessary changes in the site to accommodate Metro Mobile's equipment, or that the necessary modifications were somehow infeasible. The ALJ found that Gencom's contentions that Metro Mobile had misrepresented the availability of site No. 5 or its intention to use the property were "based on pure speculation." *Id.* at 390. He observed that Metro Mobile continued to represent that it intended to use the Eslinger property for cell No. 5, and that the Eslingers were equally unequivocal in affirming their continued willingness to lease the site to Metro Mobile. *Id.* The ALJ found that Gencom had "failed to come forward with any documentation which refutes either contention." *Id.*

Gencom continued to call for further examination of its claims regarding Metro Mobile's site No. 5 even after the Commission's final decision awarding the Phoenix license to Metro Mobile. In response to a

post-grant application by Metro Mobile seeking FCC approval for substantial changes in its cell distribution, Gencom filed a "Petition to Remand Proceedings with Instructions to Reopen the Record on the Issue of Possible Misrepresentation by Metro Mobile." *See* J.A. at 546–83. Gencom claimed that Metro Mobile's decision to redistribute all its cells, including cell No. 5, constituted new evidence supporting its contention that Metro Mobile had never intended to use the Eslingers' home as a cell site. *Id.* at 558. In response, Metro Mobile argued that its decision to relocate all its cells and to add two additional cells, was a business decision based on Metro Mobile's desire to compete effectively with the other licensed cellular system in the Phoenix market.[7]

In its reconsideration order, the Commission declined Gencom's suggestion to reopen the record concerning site No. 5. The Commission affirmed the ALJ's conclusion that Gencom's allegations in its "Motion to Enlarge" were "based on pure speculation." *See Gencom, Inc.,* 60 Rad.Reg.2d (P & F) 575, 581 (1986) (hereinafter *Phoenix Reconsideration* ). As to Gencom's "new evidence," the Commission noted that it expected post-grant changes in system design and that such modification could not be taken as tending to show that an applicant never intended to implement the design it originally proposed. *Id.* at 581.

2. *The Geographic and Population Coverage Determination—Subissue (a)(1)*

Based on the voluminous written record, the ALJ issued his initial decision on December 30, 1983. *See Gencom Inc.,* FCC No. 83D–71, J.A. at 5–34 (hereinafter *Phoenix Initial Decision* ). Under subissue (a)(1), the ALJ found that Metro Mobile's

---

7. In its initial Report and Order the Commission decided to award two cellular licenses in each Standard Metropolitan Statistical Area ("SMSA"). Under the scheme, one license would be awarded to a traditional telephone or "wireline" operator. *See Cellular Rulemaking,* 86 F.C.C.2d at 493. In Phoenix, only one wireline carrier applied and its application was granted by the same FCC order which slated the

mutually exclusive "nonwireline" applications of Gencom, Metro Mobile and CMS for comparative evaluation. *See Phoenix Designation Order,* 48 Fed.Reg. at 6032–33. The wireline licensee, Newvector Communications, Inc., commenced commercial operations in August of 1984, at least two months prior to the FCC's Final Decision awarding the nonwireline license to Metro Mobile.

proposal was superior to both of its competitors' plans in both area and population coverage, and thus awarded Metro Mobile a comparative preference in this category.[8] Specifically, the ALJ found that Metro Mobile planned to cover 17.2% of the Phoenix SMSA, as compared to 17% coverage for CMS, and 11.2% for Gencom. *See Phoenix Initial Decision*, at ¶ 7, J.A. at 7–8. Moreover, the ALJ explicitly determined that the areas exclusively covered by Metro Mobile's proposed system were areas of anticipated high demand for cellular service.[9] Gencom argued that its failure to provide coverage to certain sparsely populated areas should be considered from the standpoint of whether or not such coverage was economically justified. It produced economic studies which allegedly demonstrated that if unnecessary or uneconomical cells were removed from its competitors' systems, their coverage would closely resemble its own. *See* Gencom Rebuttal Case, J.A. at 208–11, 212–36. The ALJ did not consider Gencom's economic efficiency evidence in reaching his determination.

In its final decision, the Commission affirmed the ALJ's conclusion that Metro Mobile had demonstrated superior area and population coverage. *See Gencom, Inc.*, 56 Rad.Reg.2d (P & F) 1597, 1602 (1984) (hereinafter *Phoenix Final Decision* ). While it reduced Metro Mobile to a slight preference on this subissue vis-a-vis CMS, the Commission explicitly adopted the ALJ's

findings regarding the comparative deficiency of Gencom's coverage in relation to that of both its competitors' systems. *Id.* at 1603.

The Commission also rejected Gencom's argument that the economic efficiency of proposed coverage should play a role in the comparative analysis, stating:

We are not persuaded that refraining from providing service to sparsely populated areas, although it may be economically efficient to do so, is always in the public interest, particularly in this case, where it appears from the record that significant future demand is anticipated. We also agree with the STS [Separated Trial Staff] that the introduction of economic efficiency as a basis of comparison would not assist us in making a determination as to whose proposed coverage is superior. The massive filings that would be generated would likely be inconclusive and would add additional delay in bringing cellular service to the public.

*Phoenix Final Decision*, 56 Rad.Reg.2d (P & F) at 1603–04.

In its reconsideration order the Commission again revisited the coverage subissue. The Commission noted that in its final decision it had awarded Metro Mobile a slight preference for coverage with respect to CMS, but had not explicitly ranked Gencom's coverage proposal. Since it had up-

8. A "comparative" or "moderate" preference occupies the middle ground in the FCC's comparative hierarchy between the weightier "substantial" preference and the least significant "slight" preference. *See CMS (Pittsburgh)*, 782 F.2d at 190 n. 19. Although Metro Mobile's preference on the geographic and population subissue was accorded in relation to the CMS proposal, the ALJ left no doubt that he ranked Gencom's plan below *both* Metro Mobile's and CMS' proposals on subissue (a)(1). *See Phoenix Initial Decision*, at ¶ 8, J.A. at 8 ("Gencom's proposed system is the smallest proposed, covering less than two-thirds of the area and between 52,000 and 67,328 fewer persons than either CMS or Metro Mobile.").

9. One such pocket of exclusive coverage by Metro Mobile was the south/southwestern portion of the SMSA including the towns of Avondale, Goodyear and Buckeye, Arizona. With respect to this area, the ALJ found:

The Avondale/Goodyear area is a densely developed urban area characterized by substantial residential, industrial, commercial and transportation activities. The area is also targeted for near-future commercial and residential growth as the SMSA expands, and it is anticipated that this southwestern portion of the SMSA will experience significant population growth.... This is an area excluded from Gencom's coverage, although rated by Gencom as a section of the SMSA with the highest population density, and within the two top levels of population change. Metro Mobile's [proposed system] will, therefore, provide cellular service to 23,609 more people in this section of the SMSA than will Gencom's proposal.

*Phoenix Initial Decision*, at ¶ 10, J.A. at 9. The ALJ made similar findings with respect to two other portions of the SMSA where Metro Mobile proposed service and Gencom did not. *See id.* at ¶¶ 12–14, J.A. at 9–10.

graded Gencom's comparative status under another subissue,[10] the Commission found it necessary to compare Gencom directly to Metro Mobile under the coverage rubric. Again the Commission found that Gencom's coverage was "distinctly inferior" to that of Metro Mobile, and awarded the latter a moderate preference under subissue (a)(1). *See Phoenix Reconsideration,* 60 Rad.Reg.2d (P & F) at 580.

### 3. *The Commission's Evaluation of the Applicants' Demand Studies— Subissue (a)(2)*

Under criterion (a)(2), cellular applicants are required to provide estimates of consumer demand for mobile telephone service in their proposed coverage areas. Each of the Phoenix applicants conducted some form of direct market study to arrive at its demand projections. The ALJ declined to award any applicant a preference under this subissue, finding that "[a]ll three applicants have conducted research which is flawed in several respects." *See Phoenix Initial Decision,* at ¶ 73, J.A. at 28. Specifically the ALJ found that:

Although Gencom and CMS conducted extensive market research, both relied on a variety of underlying assumptions which are not documented by the record. For example, both applicants assume that businesses will be the primary users of cellular service. As a result, both excluded from their consideration and research the entire market potential of non-business users. A second assumption is that pager service is the precursor of cellular radio, and CMS's chosen universe for much of its research was limited to previously ascertained pager users because of this assumption.

*Phoenix Initial Decision,* at ¶ 73, J.A. at 28.

As to Metro Mobile's market survey, the ALJ found it "played no part" in projecting demand but was used only to confirm data obtained from demographic, traffic and other research. In fact, the ALJ found that "none of the applicants has persuasively demonstrated a relationship or nexus between its demand projections and its market research." *Id.* The full Commission affirmed the ALJ's refusal to award any applicant a preference for its assessment of demand in the Phoenix market. *See Phoenix Final Decision,* 56 Rad. Reg.2d (P & F) at 1603. It agreed with the judge that "Gencom's research was flawed primarily due to its unsubstantiated assumption that businesses would be the primary users of cellular." *Id.* at 1604. Additionally, the Commission noted that the ALJ had found that both Gencom and CMS had assumed that the use of paging, a one way radio service, was an accurate proxy for purposes of predicting cellular demand. *Id.*

Gencom did not raise the demand survey issue in its "Petition for Limited Reconsideration" of the Commission's final decision. Nonetheless, the FCC used its reconsideration in the Phoenix proceeding to "clarify the standard we apply under this issue." *See Phoenix Reconsideration,* 60 Rad. Reg.2d (P & F) at 579. The Commission wished to dispel any impression left by the language of the *Phoenix Final Decision* that "an applicant's failure to assess non-business demand, *in itself,* precludes the award of a preference under the relative demand issue." *Phoenix Reconsideration,* 60 Rad.Reg.2d (P & F) at 579 (emphasis added). Rather, the Commission emphasized, its approach was a flexible one, taking "into account all the flaws and advantages of the competing applicants' demand assessments, and then compar[ing] the applications to determine if any applicant has provided a 'significantly more reliable analysis of the extent and distribution of demand.'" *Id.* (quoting *Rogers Radiocall, Inc. (Chicago Final Decision),* 96 F.C.C.2d 1172, 1219 (1984), *aff'd sub nom. Cellular*

---

**10.** In its reconsideration order the Commission accepted Gencom's arguments that it should be accorded a moderate preference for its superior ability to accommodate demand. *See* 60 Rad. Reg.2d (P & F) at 578. This change placed Gencom in serious contention for the license for the first time, and thus required the Commission to reevaluate Metro Mobile in relation to Gencom. *See infra* p. 179.

*Mobile Systems of Illinois,* 782 F.2d 214 (D.C.Cir.1986)).

Under this standard the Commission reaffirmed its decision not to award Gencom any preference for its demand study. In addition to its unsubstantiated business-user assumption, the Commission pointed to "at least one other significant flaw" in its market research, namely, the assumption that pager use was an accurate predictor of future cellular demand. *Phoenix Reconsideration,* 60 Rad.Reg.2d (P & F) at 579.

### 4. The Ability to Accommodate Initial Demand—Subissue (a)(3)

In his initial decision, the ALJ awarded a comparative preference to Metro Mobile on this issue. *See Phoenix Initial Decision,* at ¶ 80, J.A. at 30. The preference accorded Metro Mobile was based more on the deficiencies in its competitors' plans than on the virtues of its own system. Concerning Gencom's proposed system, the ALJ noted that its thirteen cell-reuse design was unique, and might require difficult and expensive alterations if initial demand proved heavier than Gencom anticipated. *Id.* at ¶ 78, J.A. at 29–30. He found that neither it nor CMS' proposal, comported with "fundamental principles of cellular design." *Id.* at ¶ 77, J.A. at 29.

The full Commission reversed the preference accorded to Metro Mobile, criticizing the ALJ for adhering to one particular model of cellular design. *See Phoenix Final Decision,* 56 Rad.Reg.2d (P & F) at 1606. While noting that there was evidence in the record to suggest future expansion problems, the Commission found that "it does not appear from the record that Gencom's system will be hampered in its ability to accommodate *initial* demand." *Id.* (emphasis in original). However, since none of the applicants had demonstrated a nexus between the results of its demand study and the distribution of capacity in its cell structure, no applicant was preferred under this factor.

In its "Petition for Limited Reconsideration," Gencom argued that it had in fact demonstrated a link between the distribu-

tion of demand predicted by its study and the allocation of cells and channels within its system. The Commission agreed. Whatever the flaws in Gencom's demand study itself, the Commission found that Gencom's allocation of cell and channel capacity reflected its predictions of where demand would be concentrated. Accordingly, it granted Gencom a moderate preference under the accommodation of demand heading. *See Phoenix Reconsideration,* 60 Rad.Reg.2d (P & F) at 578.

### 5. The Issue of System Expandability—Issue (b)

In the *Phoenix Initial Decision* Metro Mobile garnered a moderate preference for its plans for system expansion. *See Phoenix Initial Decision* at ¶ 83, J.A. at 31. Again, the relative superiority of Metro Mobile's plan rested almost entirely on the perceived deficiency of its competitors' proposals. The judge noted that Gencom proposed to reuse adjacent channels within individual cells and found that such reuse might lead to intrasystem interference and was "not entirely consistent with fundamental principles of cellular design technology...." *Id.* at ¶ 82, J.A. at 31. In addition, he found that although channel borrowing among cells could accommodate Gencom's early expansion needs, satisfaction of later demand would require the construction of new cells, known as cell-splitting. "Once cell splitting is necessary," the judge found, "time consuming and inefficient reallocation of the borrowed channels to their initial position must occur. This reallocation will likely result in additional costs, service deterioration while changes are being made, and difficulty in expanding to coordinate with adjacent systems...." *Id.* at ¶ 82, J.A. at 31. In essence, the ALJ believed that Gencom's plan to reallocate voice channels among its cells to satisfy earlier demand growth would lead to later difficulties when new cells were built.

The Commission reversed the preference accorded Metro Mobile on this issue. It rejected the ALJ's "categorical" approach to system design, and reversed his findings

"to the extent that a particular set of design principles was used to evaluate the nonconforming CMS's and Gencom's system proposals." *Phoenix Final Decision*, 56 Rad.Reg.2d (P & F) at 1608.

However, the Commission explicitly affirmed the ALJ's finding that cell-splits presented an impediment to the Gencom system's future expansion, even absent any comparison with an idealized system design. *See Phoenix Final Decision*, 56 Rad.Reg.2d (P & F) at 1609. The Commission then balanced this deficiency against Gencom's proposal to build all new facilities one year ahead of demand requirements. Under this analysis the Commission determined that Gencom should receive neither a preference nor a demerit for its expansion plans. *Id.* Finding all applicants "on the same plane, in regard to their abilities to expand their differing systems," the Commission awarded no preference for expansion capabilities. *Id.*

### 6. *The Overall Comparison on the Coverage Issue*

In the final analysis, as reflected in the FCC's reconsideration order, Metro Mobile received a moderate preference under subissue (a)(1) for its more extensive geographic and population coverage, and Gencom was accorded a moderate preference on subissue (a)(3) for superior ability to accommodate demand within its more limited coverage area. The Commission noted that it had "consistently held that the area and population each applicant proposes to serve is the most important comparative factor." *See Phoenix Reconsideration*, 60 Rad.Reg.2d (P & F) at 581 n. 16. Since Metro Mobile's preference on the coverage issue outweighed Gencom's preference on the accommodation of demand issue, the Commission affirmed its grant to Metro Mobile. *Id.*

**11.** Congress sought to require of petitioners seeking designation of issues for evidentiary hearing

 a substantially stronger showing of greater probative value than is now necessary.... The allegation of ultimate, conclusionary facts

## II.

### A. *The Hearing Issue*

Gencom vigorously contends that the Commission committed reversible error in declining to hold an evidentiary hearing to explore its charges concerning both the availability of cell site No. 5 and Metro Mobile's intention to use that site. It claims that its evidence concerning the residential nature of the proposed location of cell No. 5, coupled with the evidence presented in the Zemaitis affidavit, created "a substantial and material question of fact" concerning site availability which triggered the FCC's statutory obligation to conduct a trial-like hearing on the matter. *See* Brief for Gencom Inc. at 28–33. Gencom further contends that its site availability evidence, when viewed in conjunction with Metro Mobile's post-grant decision to relocate cell No. 5, raised a substantial issue as to Metro Mobile's intent to use the Eslinger location. *Id.*

Section 309 of the Communications Act establishes the statutory framework within which the FCC conducts licensing proceedings. *See* 47 U.S.C. § 309 (1982). In 1960, Congress amended section 309(d) of the Act to significantly heighten the burden a petitioner must satisfy in order to obtain an evidentiary hearing.[11] What emerged from the congressional action is a two-pronged test for determining if allegations made in the course of a licensing proceeding require further FCC inquiry. *See* 47 U.S.C. § 309(d)(1) & (2); *Citizens for Jazz on WRVR v. FCC*, 775 F.2d 392, 394 (D.C.Cir. 1985). Initially, the Commission must determine whether the applicant seeking a hearing has set forth "specific allegations of fact sufficient to show that … a grant of the application would be prima facie inconsistent with [the public interest, convenience, and necessity]." *Citizens for Jazz*, 775 F.2d at 394; *see* 47 U.S.C. § 309(d)(1). At this stage the Commission canvasses the petition and supporting affi-

 or more general allegations on information and belief, supported by general affidavits, as is now possible with protests, are not sufficient.

*See* S.Rep. No. 690, 86th Cong., 1st Sess. 3 (1959).

davits for concrete factual assertions which if proved in a subsequent hearing would alter the Commission's public interest calculus. *See, e.g., United States v. FCC*, 652 F.2d 72 (D.C.Cir.1980) (en banc) (legal and economic conclusions concerning market structure unsupported by specific facts insufficient to pass threshold test). The Commission's inquiry at this level is much like that performed by a trial judge considering a motion for a directed verdict: if all the supporting facts alleged in the affidavits were true, could a reasonable factfinder conclude that the ultimate fact in dispute had been established. *See Citizens for Jazz*, 775 F.2d at 397.

If the Commission determines that a prima facie case has been made under section 309(d)(1), it must proceed to the second level of inquiry. Under section 309(d)(2) the Commission must determine whether "on the basis of the application, the pleadings filed, or other matters which [the Commission] may officially notice," "a substantial and material question of fact is presented." *Citizen for Jazz*, 775 F.2d at 394; *see also Newark Radio Broadcasting Ass'n v. FCC*, 763 F.2d 450 (D.C.Cir.1985); *California Public Broadcasting Forum v. FCC*, 752 F.2d 670 (D.C.Cir.1985); *Stone v. FCC*, 466 F.2d 316 (D.C.Cir.1972).

■ Here both the Commission's focus and its discretion are wider. It must consider not only petitioner's evidence, but it must weigh that evidence against the facts offered in rebuttal. *See Citizens for Jazz*, 775 F.2d at 395. It may draw factual and legal inferences from undisputed evidentiary facts, *see Stone*, 466 F.2d at 323, and it may determine how much weight to accord disputed facts based on the record before it. *See Citizens for Jazz*, 775 F.2d at 395–96 ("The drawing of inferences from undisputed proximate facts, like the balancing of disputed proximate facts, is a matter for the Commission's judgment."). From this analysis the Commission must determine "whether the totality of the evidence arous-

es a sufficient doubt on the point that further inquiry is called for." *Id.* at 395.[12]

Our role in reviewing the Commission's determination is a limited one. "[T]he decision of whether or not hearings are necessary or desirable is a matter in which the Commission's discretion and expertise is paramount. We must examine the Commission's statement of reasons for denial, and if the Commission's action was not arbitrary, capricious or unreasonable, we must affirm." *United States v. FCC*, 652 F.2d at 91 n. 87; *see also Columbus Broadcasting Coalition v. FCC*, 505 F.2d 320, 324 (D.C.Cir.1974); *Stone*, 466 F.2d at 322; *Southwestern Operating Co. v. FCC*, 351 F.2d 834, 835 (D.C.Cir.1965) ("We have no doubt that Congress intended to vest in the FCC a large discretion to avoid time-consuming hearings....").

■ Under the applicable standard of review, we have little difficulty upholding the Commission's decision not to conduct an evidentiary hearing in this case. The ultimate issue before the FCC can be stated as follows: Did Metro Mobile have a "reasonable assurance" that the Eslinger property was available for use as a cell site when it filed its application? *See Advanced Mobile Phone Service*, 54 Rad.Reg.2d (P & F) 185, 191 (1983) (Houston Designation Order) ("An applicant need not have a binding agreement or absolute assurance of availability of a proposed site but rather must show that it has obtained reasonable assurance that its proposed site is available.").

We agree with the Commission's determination that Metro Mobile's evidence provided a "reasonable assurance" that the Eslinger site was available as a transmitter location. The Commission had before it a site availability letter predating Metro Mobile's application and the sworn statement of the property owner, both unequivocal in confirming the site's availability. The Zemaitis affidavit (even if believed) alleged no actions or statements by Mrs. Eslinger indi-

---

**12.** Gencom confounds the first and second tests. It argues that "the petitioner's burden is one of *prima facie* sufficiency,' which means that evidence must be offered to make, not a fully persuasive case, but rather what a reasonable

fact-finding [sic] *might* view as a persuasive case." Brief for Gencom Inc. at 29 (citation omitted). This, as we have noted, is only a threshold requirement.

cating that she would not honor her commitment to Metro Mobile.

The only uncontested item in the record to support Gencom's position was the fact that the Eslinger property was located in a residential neighborhood. The ALJ refused to draw any inference of unavailability from this fact, finding that Gencom had failed to set forth facts indicating that "the owners of the property, the Eslingers, are unwilling to permit the necessary changes in the site to accommodate Metro Mobile's plans for that site, or that necessary modifications in the site cannot be made." *See* J.A. at 390. The ALJ's decision was in accord with FCC precedent, and we cannot say it was unreasonable. *See Central Texas Broadcasting Co.*, 74 F.C.C.2d 393, 405 (1979) (no site availability issue designated against applicant where no facts tending to establish owner's unwillingness to accommodate transmitter alleged).[13]

When Metro Mobile's rebuttal evidence is factored into the analysis, including the sworn statement of the property owner that she was ready and willing to make any alterations necessary to house Metro Mobile's equipment, the conclusion that Metro Mobile had a reasonable assurance that site No. 5 was available for its use becomes almost inescapable. *See Advanced Mobile Phone Service*, 54 Rad.Reg.2d (P & F) 418, 422–23 (1983) (New Orleans Designation Order) (designation of site availability issue denied where cellular applicant had produced site availability letter and affidavit of property owner).

Nothing in the Zemaitis affidavit directly contradicted Mrs. Eslinger's sworn statements. He claimed that Mrs. Eslinger told him that her property had been substituted as a cell site until a more amenable site could be found. *See supra* p. 7. Even assuming the statement was made, it is far from self-evident that Mrs. Eslinger was therefore unwilling to accommodate the

transmitter if a new site were not found. Moreover, the Commission had before it the sworn statement of Mrs. Eslinger denying ever having spoken to Zemaitis, and that of John Brennan, indicating that Metro Mobile was not presently seeking to replace site No. 5. *See supra* p. 8.

Reviewing the total picture the Commission had before it, "nothing suggests to us that a further hearing would produce additional facts that might change the result." *Capitol Broadcasting Co. v. FCC*, 324 F.2d 402, 405 (D.C.Cir.1963).

Nor did Gencom's evidence create a substantial and material factual dispute with respect to Metro Mobile's intent to use the Eslinger property. Zemaitis' assertion that Metro Mobile negotiated for more desirable locations and then settled on the Eslinger site provides little support for the proposition that Metro Mobile did not intend to use the designated site. Similarly, the allegation that Metro Mobile continued its search for a more amenable location after designating site No. 5 does not perforce impugn its intention to use the site *at the time its application was filed*. It would be perverse indeed for the Commission to draw an inference of misrepresentation from the fact that an applicant aggressively pursued superior locations for its equipment both before and after site designation. Such a rule would render potential licensees timorous in their initial search for transmitter locations and essentially put an end to any post-designation efforts to ameliorate their proposed systems. The Commission's refusal to draw any inference of misrepresentation from these factual assertions was thus eminently reasonable.

A similar analysis obtains with respect to the undisputed fact that Metro Mobile chose to relocate cell No. 5 after its application was granted. The decision to relocate all its cells and to add two additional cells coming as it did two and one-half years

---

**13.** To the extent Gencom's site availability arguments rest on the fact that a zoning change would have been necessary in order to install a transmitter on the Eslingers' property, such reliance is misplaced. It is well-settled Commission policy that an applicant for a construction permit need not demonstrate advance government approval, or even the likelihood thereof, in order to have a "reasonable assurance" of site availability. *See, e.g., Northbanke Corp.*, 46 Rad.Reg.2d (P & F) 453, 457 (1979); Chronicle Publishing Co., 45 F.C.C. 1545, 1546 (Rev.Bd. 1964).

after the filing of its application is only marginally relevant to Metro Mobile's intent to use site No. 5 when its application was filed. Its weak probative value is further undermined by Metro Mobile's explanation that the overhaul of its entire system was compelled by the necessity of matching the superior coverage of its wireline competitor. The redesign of its *entire* system to *increase* its coverage would certainly seem an extravagant measure for an applicant to take to disembarrass itself of a cell site that it had no intention of using.

In its initial *Cellular Rulemaking*, the Commission recognized that "a permittee or licensee may wish at some point to modify transmitter locations or add more transmitter locations." *See* 86 F.C.C.2d at 509. It established a regulatory structure under which operators would have substantial flexibility in adapting their systems to meet consumer needs. *Id.* at 509–10. Designating misrepresentation issues against grantees who avail themselves of these provisions would render them a trap for the unwary, and disserve the public interest by forever wedding applicants to their initial system proposal however inadequate it has become in light of subsequent developments. In sum, the drawing of inferences from undisputed facts is the Commission's province, *see Citizens for Jazz*, 775 F.2d at 395; *Stone*, 466 F.2d at 323, and here the Commission's decision not to draw an inference of misrepresentation from the facts presented is a reasonable one. *See Washington Ass'n for Television v. FCC*, 665 F.2d 1264 (D.C.Cir.1981) (no hearing on misrepresentation charges necessary where Commission capable of applying its expertise to undisputed facts).

## B. *The Coverage Issue*

Gencom attacks the FCC's decision not to consider its economic efficiency evidence on two legal grounds. First, it argues that the Commission violated its statutory mandate by failing to consider whether each individual cell in an applicant's proposed system would be economically self-sustaining. *See* Brief for Gencom Inc. at 36–38. Second, it contends that a public notice published by the Commission's Common Carrier Bureau led it to believe that the economic efficiency of proposed coverage would be considered in the comparative process. *Id.* at 38–40.

Gencom's first argument amounts to little more than a thinly disguised attempt to challenge the Commission's selection of relevant comparative criteria in its *Cellular Rulemaking*. The Commission's authority to limit the issues it will consider in a comparative proceeding through prior notice-and-comment rulemaking is well-established. *See FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 793, 98 S.Ct. 2096, 2111, 56 L.Ed.2d 697 (1978); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 202, 76 S.Ct. 763, 770, 100 L.Ed. 1081 (1956). In its *Cellular Rulemaking*, the Commission reasonably concluded that the public interest would best be served by the widest possible availability of cellular service. *See* 86 F.C.C.2d at 503. Its decision to place substantially less comparative emphasis on rate levels serves as a further indication of its desire to promote coverage over pure efficiency. *Id.* Gencom did not challenge these policy choices in the public rulemaking, and has in fact benefited from their application in other cellular markets. *See Celcom Communications Corp. v. FCC*, 787 F.2d 609 (D.C. Cir.1986) (Atlanta) (Gencom's preference on area coverage upheld against competitor's argument that comparison of coverage bears no relation to the public interest). What was said of Gencom's competitor's arguments in the Atlanta proceeding applies with equal force to Gencom's contentions here: "It is simply too late in the day to attack the comparative process itself or a comparative criterion which went unchallenged at the time it was adopted." *Celcom*, 787 F.2d at 612. *Accord Western Union Tel. Co. v. FCC*, 665 F.2d 1126, 1146–47 (D.C.Cir.1981).

Gencom further contends that it proposed a smaller more efficient system in reliance on a public notice describing cellular filing procedures issued by the FCC's Common Carrier Bureau. *See* Brief for Gencom Inc. at 38 (quoting *Cellular Communications Systems (Filing Proce-*

*dures)*, Public Notice No. 2973, 51 Rad. Reg.2d (P & F) 143, 145 (1982)). Thus Gencom argues that the Commission arbitrarily altered its decisional standards by considering area and population coverage without weighing Gencom's cost-efficiency evidence.

■ Gencom's argument fails to convince for several reasons.

First, the Public Notice cannot bear the weight Gencom would have it carry. In essence, it simply states that an applicant will "not necessarily" be penalized for failure to serve the entire SMSA for which it is applying. *See* 51 Rad.Reg.2d (P & F) at 145. It goes on to suggest that the extent of proposed coverage should be reasonably related to forecasted demand. It concludes by referring the applicant to paragraph seventy-six of the *Cellular Rulemaking,* wherein the Commission stated, "Because nationwide availability of service is a primary goal, a major basis of comparison will be the geographic area an applicant proposes to serve." *See* 86 F.C.C.2d at 502.

We read the Public Notice as a simple warning to applicants that the padding of coverage with uninhabited areas will not receive comparative credit, rather than a guarantee that a cost/benefit analysis will be applied to each increment of additional coverage in a proposed system. Gencom's reliance argument is further crippled by the fact that the designation of the issues in the Phoenix proceeding itself, which postdated the Public Notice by almost a year, makes no mention of economic efficiency, but instead reaffirms the Commission's commitment to the widest possible availability of cellular service. *See Phoenix Designation Order,* 48 Fed.Reg. 6030 (1983).

Moreover, the Commission's findings concerning population coverage belie Gencom's assertion that its system was designed with a cost-to-potential-revenue type formula in mind. As the ALJ noted, some of the areas where coverage was proposed by Metro Mobile but not Gencom, were areas in which *Gencom* itself predicted high cellular demand. *See Phoenix Initial Decision* at ¶¶ 9–10, J.A. at 8–9. Nor did

Gencom exhibit any rate savings from its supposedly more efficient coverage, *see id.* at ¶¶ 53–54, J.A. at 23–24, and it does not appeal from the Commission's determination not to award any applicant a preference for rate structure. We conclude, as we did in the Chicago proceeding, that "[t]here was absolutely no doubt that the applicant which proposed greater coverage, as measured primarily by geographic area and population, would receive the preference." *Cellular Mobile Systems of Illinois, Inc. v. FCC,* 782 F.2d 214, 225 (D.C. Cir.1986) (footnote omitted).

## C. *The Relative Demand Issue*

Gencom faults the Commission's failure to grant it a comparative preference under this subissue for two reasons. First, it argues that it did in fact adequately substantiate the assumption built into its demand survey that businesses would be the primary users of cellular service. Brief for Gencom Inc. at 48–52. It claims that its decision to survey only businesses to assess demand in the Phoenix market was based on its past experience in providing conventional two-way radiotelephone service in Phoenix. *Id.* at 51. Thus, it contends that the Commission's decision not to award it a preference for its market research is inconsistent with cellular decisions in other markets where applicants have garnered preferences for business-only demand studies. *Id.* at 55.

Second, Gencom argues that the Commission misread the ALJ's initial decision in concluding that its demand assessment was further flawed by its reliance on pager use as an accurate predictor of cellular demand. Brief for Gencom Inc. at 55–58. It maintains that there is no factual support in the record for this conclusion, and that the ALJ's criticism of the "pager assumption" was directed exclusively at CMS. *Id.* Gencom concludes that once these two unwarranted demerits are expunged, its otherwise superior demand study must be preferred over those of its two competitors. *Id.* at 58–59. Since we find that the chain of Gencom's legal reasoning fails to hold at either critical link, we reject its conclusion,

and find that the FCC's decision to award no comparative preferences under this criterion was a reasonable one.

■ Gencom is correct in observing that the Commission has in the past awarded preferences to applicants who have conducted market studies designed to measure only business demand. At the same time, it has consistently required that those applicants provide some factual support for their assumption that non-business demand would be inconsequential. *See Rogers Radiocall, Inc.,* 96 F.C.C.2d 1172 (hereinafter *Chicago Final Decision*), *reconsideration denied,* 98 F.C.C.2d 1293 (1984), *aff'd sub nom. Cellular Mobile Systems of Illinois, Inc. v. FCC,* 782 F.2d 214 (D.C.Cir. 1986); *Celcom Communications Corp. of Pennsylvania,* 58 Rad.Reg.2d (P & F) 1219 (hereinafter *Philadelphia Final Decision*), *aff'd on reconsideration,* 58 Rad. Reg.2d (P & F) 1132 (1985) (hereinafter *Philadelphia Reconsideration*), *aff'd sub nom. Cellular Mobile Systems v. FCC,* 792 F.2d 239 (D.C.Cir.1986) (hereinafter *CMS (Philadelphia)*).

In the Chicago proceeding, as in Phoenix, all three applicants limited their demand surveys to business users. The winning applicant, Rogers Radiocall, was accorded a moderate preference for its demand survey despite its exclusive focus on commercial use. The ALJ found that Rogers had substantiated its business-only assumption with a study indicating that businesses were the primary users of conventional two-way radio, as well as a showing that cellular service would be overpriced for the residential market. *See Rogers Radiocall, Inc.,* 96 F.C.C.2d 1194, 1198–99 & n. 11 (1983) (*Chicago Initial Decision*). The issue was not directly raised before the full Commission on review, and it simply stated that Rogers had made its assumptions explicit and that they appeared reasonable. *See Chicago Final Decision,* 96 F.C.C.2d at 1180–81. Based on the entire record, including the deficienices of its rivals' demand studies, the Commission affirmed the ALJ's conclusion that Rogers had provided "a significantly more reliable analysis of

the extent and distribution of demand for cellular service in Chicago." *Id.* at 1811.

In the Philadelphia proceeding, Automatic Wide Area Cellular Systems ("AWACS") received a moderate preference for demand protections based only on commercial survey data. *See Philadelphia Final Decision,* 58 Red.Reg.2d (P & F) at 1224–25. On petition for review, this court explicitly affirmed the Commission's conclusion, stating:

> AWACS did not merely assume that business users would be the only significant cellular customers. Instead, AWACS conducted a residential survey and, based on the results of this survey, the advice of its consultants, and its own business judgment, AWACS reasonably concluded that nonbusiness use would be insignificant.

*CMS (Philadelphia),* 792 F.2d at 240 (footnote omitted).

In contrast to the evidence produced by the Chicago and Philadelphia applicants to justify their exclusion of potential residential users from their demand projections, Gencom provided the Commission with little support for its decision to ignore non-business demand. In its direct case Gencom offered the testimony of Michael Moore, a Vice President of Compucon, Inc., the market research firm which conducted Gencom's demand study. *See J.A.* at 64–92. He indicated that Gencom's demand projections were based entirely on 300 telephone interviews with randomly selected businesses in the Phoenix area. *Id.* at 65, 72–73. As to *why* a business-only universe was selected for the survey, Mr. Moore stated:

> Business establishments rather than residences were surveyed because of our conclusion that cellular service would be used primarily by business owners and employees in conjunction with their occupations or commuting to their place of work as opposed to personal use by private individuals outside of business hours or drive time.

*Id.* at 75.

This is nothing more than a restatement of the assumption itself. While we agree

with Gencom that it thus made its underlying assumption explicit, we cannot agree that it provided the Commission with evidence which suggested that its assumption was based on the reasonable exercise of its business judgment. *Compare Chicago Final Decision,* 96 F.C.C.2d at 1180–81; *Philadelphia Reconsideration,* 58 Rad. Reg.2d (P & F) at 1135.

As we indicated in our review of the Pittsburgh proceeding, "[s]ophisticated applicants such as [Gencom] would be rather naive to believe that the FCC would meekly accept [their] demand studies as valid ... the FCC could realistically undertake this entire exercise only by examining assumptions and methodology to determine whether an applicant's demand forecast was likely to be valid." *CMS (Pittsburgh),* 782 F.2d 182, 206 (D.C.Cir.1985). At the time Gencom filed its direct case, the Commission's regulations specifically required that all statistical studies, including sample surveys, introduced in any common carrier proceeding, be supported by "supplementary details ... so as to give a comprehensive delineation of the assumptions made, the study plan utilized and the procedures undertaken." *See* 47 C.F.R. § 1.363(a) (1981).

Based on our review of the record before us, we cannot say that the Commission's conclusion that Gencom had not adequately substantiated its business-only assumption was not supported by substantial evidence or was otherwise arbitrary or capricious. *See Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir.1970) (court's role in reviewing comparative licensing proceeding "is to assure that the agency has given reasoned consideration to all the material facts and issues"), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). We thus affirm the Commission's determination that Gencom's exclusion of residential demand from its analysis was inadequately substantiated.

Gencom's second attack on the FCC's evaluation of its demand study rests on the Commission's allegedly erroneous finding that Gencom had relied on pager use as a rough analogue for cellular in formulating its demand protections. All three applicants in the Phoenix proceeding conducted primary as well as secondary market research. *See Phoenix Initial Decision,* at ¶¶ 16–30, J.A. at 10–15. Primary research consists of direct contact with potential customers through telephone or mail surveys, while secondary research generally entails computer evaluation of demographic and population statistics, as well as in some cases, analysis of conventional radiotelephone and/or pager use. *See generally CMS (Pittsburgh),* 782 F.2d at 190–91. As noted above, Gencom's primary research in the Phoenix market consisted of a telephone survey of 300 randomly selected business establishments in the SMSA. Gencom applied the level of interest expressed by its survey sample to the projected number of businesses in the Phoenix area in arriving at a figure for total potential demand in the Phoenix market. *See* J.A. at 79. Gencom's secondary research consisted in part of an analysis of the historical rate of demand for radiotelephone and paging services in Phoenix as well as other markets. *Id.* at 84. By projecting the demand rate for conventional radiotelephone and pager use forward Gencom arrived at an acceptance or "penetration" rate for cellular service, *i.e.,* a prediction of the number of potential customers identified through its primary research who would actually subscribe to cellular service. *Id.* at 84–86. Gencom acknowledges that it made this limited use of pager data in its secondary research to determine cellular acceptance rates and hence final demand projections. *See* Brief for Gencom Inc. at 57. However, it argues that it was not this fact that the Commission relied upon in criticizing its demand assessment. In his initial decision the ALJ observed that CMS had limited much of its *primary* research to previously confirmed pager users. *See Phoenix Initial Decision* at § 73, J.A. at 28. The reference to CMS' limitation of its survey universe came in a paragraph discussing both CMS' and Gencom's demand studies. *See supra* p. 13. Gencom maintains that the Commission in both its final decision and reconsideration order erroneously ascribed the ALJ's criticism of CMS' primary research to Gencom. *See* Brief for Gencom Inc. at 57–58.

The language of the FCC's final decision is unclear in this regard. Referring to both Gencom and CMS, the Commission stated, "they both assumed that paging, a one-way radio service, is a representative model for cellular and that paging subscribers would be most likely to demand cellular two-way radio." *Phoenix Final Decision,* 56 Rad.Reg.2d (P & F) at 1604. Gencom did indeed assume that paging was a representative model for cellular in formulating its acceptance rate for potential cellular users, it did not do so in structuring its primary survey universe.

■ We decline to decide this issue, for even if Gencom is correct in its contention that the FCC misread the initial decision, Gencom *never raised* this issue before the Commission. Gencom's omission deprives us of both an adequate record and the benefit of the FCC's expertise in resolving this issue.

The scope of our review of FCC orders is expressly limited by 47 U.S.C. § 405, which provides in pertinent part:

> The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report or action, except where the party seeking such review ... relies on questions of fact or law upon which the Commission ... has been afforded no opportunity to pass.

47 U.S.C. § 405 (1982).

Our cases have construed section 405 to require complainants to give the Commission a "fair opportunity" to pass on a legal or factual argument before coming to the court. *See Washington Ass'n for Television & Children v. FCC,* 712 F.2d 677, 681 (D.C.Cir.1983); *Alianza Federal de Mercedes v. FCC,* 539 F.2d 732, 739 (D.C. Cir.1976).

Although not a model of clarity in all respects, the Commission's final decision was crystal clear in one regard—Gencom's demand study was explicitly penalized for assuming that pager use was an adequate basis for predicting cellular demand. Yet Gencom inexplicably limited its "Petition for Reconsideration" to another aspect of the Commission's decision, by-passing an opportunity to correct what it now asserts is a completely unsupported factual error. Moreover, Gencom had a second opportunity to bring the alleged error to the FCC's attention, after the Commission *sua sponte,* repeated its findings on the relative demand issue in its Reconsideration Order. *See Phoenix Reconsideration,* 60 Rad. Reg.2d (P & F) at 579.

As we have noted in the past, "[o]ne of the purposes of [section] 405 is to afford the Commission the initial opportunity to correct errors in its decision...." *Rogers Radio Communications Services v. FCC,* 593 F.2d 1225, 1229 (D.C.Cir.1978). In a highly technical area such as this one, meaningful review without a clear statement from the Commission on the disputed issue is well-nigh impossible. Since Gencom twice eschewed opportunities to raise its objections before the Commission, we hold that it is precluded from doing so for the first time before this court.

Having rejected both of Gencom's challenges to the Commission's evaluation of its demand analysis, we affirm the FCC's conclusion that Gencom did not merit a preference under this subissue.

### D. *The Expansion Issue*

Gencom launches two attacks on the Commission's analysis under this criterion. First, it argues that the Commission's final decision is internally inconsistent in its treatment of Gencom's somewhat novel system design. Brief for Gencom Inc. at 64–65. Second, it asserts that the Commission's consideration of the cost of Gencom's method of expansion conflicts with its earlier refusal to apply cost/benefit analysis to initial coverage under subissue (a)(1). We reject both of Gencom's arguments and affirm the FCC's decision to award no preference under this issue.

In its initial decision, the ALJ criticized Gencom's proposal as inconsistent with "fundamental principles of cellular design technology." *See supra* p. 16. He based his conclusion on theoretical writings in the area which suggested that Gencom's plan to reuse adjacent channels within individual cells might lead to co-channel interference. *See Phoenix Initial Decision,* at ¶ 44, J.A. at 20 (citing MacDonald, *The Cellular Con-*

*cept,* 58 Bell Sys.Tech.J. 15 (1979)). In addition, the ALJ cited expensive cell-splits and the concomitant reallocation of channels to new cells as a second and independent flaw in Gencom's proposal. *Phoenix Initial Decision* at ¶ 44, J.A. at 20.

In its final decision the Commission reversed the ALJ's criticism of Gencom's expansion proposal *"to the extent* that a particular set of design principles was used to evaluate the non-conforming CMS' and Gencom's system proposals." *Phoenix Final Decision,* 56 Rad.Reg.2d (P & F) at 1608 (emphasis added). However, the Commission adopted the ALJ's criticism of Gencom's plan *to the extent* that it would require costly cell-splits to accommodate demand beyond the first year. *Id.* at 1609, J.A. at 47.[14] Gencom argues that the Commission did a complete about face on this issue, first "rehabilitating" its unique design in one breath and then essentially readopting the ALJ's criticisms of it in another. We disagree.

The FCC relied on its final decision in the Pittsburgh proceeding in reversing the ALJ's devotion to one particular model of cellular design. *See Phoenix Final Decision,* 56 Rad.Reg.2d (P & F) at 1609. In *MCI Cellular Tel. Co.,* 96 F.C.C.2d 1015 (1984) (hereinafter *Pittsburgh Final Decision*), *aff'd, CMS (Pittsburgh),* 782 F.2d 182 (D.C.Cir.1985), the Commission determined not to accord a *per se* preference to any particular arrangement of cells or channels within a cellular system. *See Id.* at 1029. Specifically, the Commission refused to adopt the MacDonald study's finding that the uniform arrangement of cells in a hexagonal grid was necessary to avoid co-channel interference between cells. *Id.* at 1030. The FCC indicated that it would not penalize an applicant "merely because it chooses not to follow the conventional wisdom" concerning cellular system design. *Id.* at 1029.

■ We see no inconsistency between the FCC's approach in its Pittsburgh decision and its Phoenix decision. The Pitts-

burgh decision stands for the proposition that a system will not be penalized strictly based on its unique design. It does not indicate that the FCC will not consider the pluses and minuses of both traditional and nontraditional designs outside of any preconceived notions concerning their relative merit. The FCC eschewed a right approach in its Pittsburgh decision in order to avoid discouraging innovation in system design. *See Pittsburgh Final Decision,* 96 F.C.C.2d at 1029. It would be ironic indeed if the Commission was thereby precluded from judging the relative worth of new system designs *on their own merits.*

The Phoenix decision is consistent with this policy. While disavowing rigid adherence to any one set of design principles, the Commission found Gencom's proposal, unique or not, suffered from independent expansion difficulties. We think that decision was a reasonable one.

Finally, Gencom contends that the Commission's consideration of the cost of its expansion plan under issue (b) conflicts with its refusal to consider the economic efficiency of coverage proposals under subissue (a)(1).

■ We reject this argument for several reasons. First, the ALJ's criticism of cell-splitting was not based on cost concerns alone. He noted that the reallocation of channels to new cells, which cell-splitting would necessitate, would also entail "service deterioration while changes are being made, and difficulty in expanding to coordinate with adjacent systems." *Phoenix Initial Decision* at ¶ 44, J.A. at 20. The Commission's initial *Cellular Rulemaking* specifically alluded to both cell-splitting and an applicant's ability to coordinate the use of its channels with neighboring cellular systems as relevant to the expansion analysis. *See* 86 F.C.C.2d at 502–03.

Moreover, the Commission's consideration of cost under the expansion issue differed markedly from the detailed analysis of coverage costs to expected revenues

---

**14.** Gencom's 13–cell reuse plan assigned all available voice channels (312) among all 13 of its cells. If all channels are uniformly distributed, such a system would have 24 available voice channels per cell. Since the number of chan-

nels per cell is so limited, Gencom would quickly exhaust its individual cell-capacity and be forced to "cell-split," *i.e.,* to construct new cells to handle the demand overload.

which Gencom urged the Commission to adopt under issue (a)(1). Under the expansion issue, the Commission simply noted, based on the evidence already before it, that Gencom's expansion costs would probably be greater *relative to those* of its two competitors. Thus none of the "massive filings" or attendant delay that the Commission feared would flow from adoption of a cost/benefit analysis of coverage was involved here. As a simple matter of procedure, we think the Commission could take notice of relative cost differences between expansion plans without obligating itself to engage in a wholly different analysis involving a massive influx of new evidence. The Commission has broad discretion to establish the relevant issues in a comparative licensing proceeding. *See United States v. Storer Broadcasting Co.*, 351 U.S. 192, 203–04, 76 S.Ct. 763, 770–71, 100 L.Ed. 1081 (1956). We cannot say that discretion has been abused in this case.

### III.

As we have previously noted, cellular technology has been available for well over a decade, yet its march from the theoretical stage to the market place has been a slow one. *See MCI Cellular Tel. Co. v. FCC*, 738 F.2d 1322, 1328 (D.C.Cir.1984). In its *Cellular Rulemaking* the Commission attempted to establish a comparative process that embodied a consideration of the relative merit of proposed systems within the framework of procedural efficiency. Pursuant to these guidelines, the agency has on three different occasions found Metro Mobile to be the best qualified applicant in the Phoenix market. Throughout the licensing process Metro Mobile has consistently demonstrated that it would make the benefits of cellular technology available to the largest percentage of Phoenix residents. The Commission's charter requires it to regulate the airwaves "so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, ... radio communication service...." 47 U.S.C. § 151 (1982). We think the Commission's weighing of the evidence and argument presented in the Phoenix cellular proceeding was consistent with this broad mandate.

We hold that the Commission's findings and conclusions are supported by substantial evidence and are neither arbitrary nor capricious. We therefore affirm the Commission's decision and, accordingly, the petition for review is

*Denied.*